

FILED

OCT 2 7 2015

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| WILLIAM G. CLOWDIS, JR., MD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 315cv128 |
| | ) | |
| JOEL JEREMY SILVERMAN, MD, | ) | |
| MCV ASSOCIATED PHYSICIANS | ) | |
| (d/b/a MCV PHYSICIANS) | ) | |
| WILLIAM L. HARP, MD, | ) | |
| JENNIFER L. DESCHENES, JD, MS | ) | |
| LORETTA S. HOPSON-BUSH, | ) | |
| AMY STEWART, | ) | |
| SANDRA WHITLEY RYALS, | ) | |
| RENEE S. DIXSON, | ) | |
| SHERRY FOSTER, R.N. | ) | |
| DEPARTMENT OF HEALTH | ) | |
| PROFESSIONS VIRGINIA BOARD OF | ) | |
| MEDICINE, THE VIRGINIA HEALTH | ) | |
| PRACTITIONER'S MONITORING | ) | |
| PROGRAM,  NATIONAL | ) | JURY TRIAL DEMAND |
| PRACTITIONER DATABASE, | ) | |
| VIRGINIA COMMONWEALTH | ) | |
| UNIVERSITY, VIRGINIA | ) | |
| COMMONWEALTH UNIVERSITY | ) | |
| HEALTH SYSTEM and the | ) | |
| COMMONWEALTH OF VIRGINIA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## SECOND AMENDED COMPLAINT FOR MANDAMUS AND DAMAGES

### INTRODUCTION

The plaintiff, William G. Clowdis, Jr., MD, brings this complaint to this Court for

entry of judgment in his favor against Joel Jeremy Silverman, MD, MCV Associated

Physicians (d/b/a MCV Physicians), William L. Harp, MD, Jennifer L. Deschenes, JD,

MS, Loretta S. Hopson-Bush, Sandra Whitley Ryals, Amy Stewart, Renee S. Dixson,

Sherry Foster, R.N., The Department of Health Professions Virginia Board of Medicine,

The Virginia Health Practitioner's Monitoring Program, Virginia Commonwealth

University and Virginia Commonwealth University Health System ("VCUHS")

collectively ("VCU"), National Practitioner Database and the Commonwealth of

Virginia, collectively referred to as "Defendants", and in support of such Complaint avers

as follows:

## NATURE OF ACTION AND JURISDICTION

1. This is a civil action under the Americans with Disabilities Act, 42 U.S.C.

§12101, *et seq.* ("ADA"), § 504 of the Rehabilitation Act of 1973 ("Section 504"), and

42 U.S.C. §1983 seeking damages, injunctive relief and a writ of mandamus against

Defendants for committing acts, under color of law, with the intent and under the color of

law for the purpose of depriving Plaintiff of rights secured under the Constitution and

laws of the United States and Virginia; and for refusing or neglecting to prevent such

deprivations and denials to Plaintiff.

2. The case arises under the United States Constitution, 42 U.S.C. §12101, *et seq.*

and 42 U.S.C. § 1983, as amended.  This Court has primary jurisdiction in this matter

pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over all

Commonwealth of Virginia causes of action pursuant to 28 U.S.C. § 1367.  The

declarative and injunctive relief sought is authorized by 28 U.S.C. §§ 2201 and 2202, 42

U.S.C. §12101, *et seq.*, 42 U.S.C. § 1983 and Rule 57 of the Federal Rules of Civil

Procedure.

3. Plaintiff brings this action resulting from damages incurred due to his unlawful

indefinite suspension of his medical license by the Virginia Board of Medicine on or

2

about April 26, 2007, and after a hearing on or about May 11, 2011, the additional
damages incurred by requiring monitoring based on testimony by Defendant, Joel Jeremy
Silverman, MD ("Silverman") acting under color of law in bad faith with an undisclosed
conflict of interest in rendering his purported independent medical evaluation ("IME")
and continuing thereafter through his Virginia Health Practitioner's Monitoring Program
("HPMP") discriminating against Plaintiff in violation of Title II of the ADA and in
violation of Plaintiff's Constitutional rights, and laws of the United States and Virginia.

 4. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. §
1391(b)(1) and (b)(2). The actions complained of took place in this judicial district;
evidence and records relevant to the allegations are maintained in the judicial district; and
all Defendants are present and regularly conduct affairs in this judicial district.

**PARTIES**

 5. Plaintiff William G. Clowdis, Jr. ("Clowdis") is a former physician. He currently
resides in Virginia.

 6. Defendant Joel Jeremy Silverman, MD ("Silverman"), is a medical doctor,
residing and practicing in Virginia, in his individual (personal) and official capacity as
Chairman, Department of Psychiatry at Virginia Commonwealth University including
VCU Health System ("VCUHS") collectively ("VCU"), Chief Executive Officer for the
Virginia Health Practitioner's Monitoring Program ("HPMP"), and in his individual
capacity as a private for-hire independent medical examiner as Dr. Silverman's office
address is VCU, MCV Campus School of Medicine, Dept. of Psychiatry, West Hospital,
1200 East Broad Street, Room 8-142 (Eighth Floor, North Wing, Room 142), P.O. Box
980710, Richmond, Virginia 23298.

3

7.  Defendant MCV Associated Physicians (d/b/a MCV Physicians) is a Virginia Domestic Corporation whose registered agent is Anne G. Scher, 830 East Main Street, Suite 1703, P.O. Box 980521, Richmond, VA 23298.

8.  Defendant Department of Health Professions Virginia Board of Medicine ("Medical Board") is a public and quasi-private agency established under the laws of the Commonwealth of Virginia, charged with regulating the practice of Medicine and other branches of the healing arts in Virginia.  It has its official address at 9960 Mayland Drive, Suite 300, Henrico, Virginia 23233.

9.  Defendant William L. Harp, MD ("Harp"), is a medical doctor, residing and practicing in Virginia, individually (personally) and in his official capacity as executive director of the Virginia Medical Board.  The Medical Board's official address is 9960 Mayland Drive, Suite 300, Henrico, Virginia 23233.

10. Defendant Jennifer L. Deschenes, JD, MS ("Deschenes"), is a lawyer, residing and practicing in Virginia, individually (personally) and in her official capacity as deputy executive director of discipline and counsel for the Virginia Medical Board.  The Medical Board's official address at 9960 Mayland Drive, Suite 300, Henrico, Virginia 23233.

11. Defendant Loretta S. Hopson-Bush ("Hopson-Bush") resides and works in Virginia, individually (personally) and in her official capacity as senior investigator, enforcement division, for the Virginia Medical Board.  The Medical Board's official address is 9960 Mayland Drive, Suite 300, Henrico, Virginia 23233.

12. Defendant Amy Stewart ("Stewart") resides and works in Virginia, individually (personally) and in her official capacity as a case manager at HPMP.  HPMP's official address is 700 E. Franklin Street, Suite 300 Tower, Richmond, Virginia 23219.

4

13. Defendant Sandra Whitley Ryals ("Ryals") resides and works in Virginia, individually (personally) and in her official capacity as the Director of the Department of Health Professions. The Department of Health Profession's official address is 6603 West Broad Street, 5th Floor, Richmond, Virginia 23230-1712.

14. Defendant Renee S. Dixson ("Dixson") resides and works in Virginia, individually (personally) and in her official capacity as Discipline Case Manager, for the Virginia Medical Board. The Medical Board's official address is 9960 Mayland Drive, Suite 300, Henrico, Virginia 23233.

15. Defendant Sherry Foster, R.N. ("Foster") resides and works in Virginia, individually (personally) and in her official capacity as senior investigator, enforcement division, for the Virginia Medical Board. The Medical Board's official address is 9960 Mayland Drive, Suite 300, Henrico, Virginia 23233.

16. Defendant Virginia Health Practitioner's Monitoring Program ("HPMP") is a private entity operating as the sole contractor for the Department of Health Professions and established under the laws of the Commonwealth of Virginia charged with monitoring health care practitioners. Its CEO is Joel Jeremy Silverman, MD. It has its official address at 701 East Franklin Street, Suite 1407, Richmond, VA 23219.

17. Defendant National Practitioner Databank ("NPDB") is a United States agency and public entity created by Congress charged with establishing and maintaining a confidential clearinghouse for adverse actions related to healthcare provider licensure among many other tasks. It has its official address at The Data Bank, P.O. Box 10832, Chantilly, VA 20153-0832.

5

18. Defendant Virginia Commonwealth University is a public entity[1] and operates its health-related activities through VCU Health System ("VCUHS"), collectively ("VCU"). Its official address is 910 West Franklin Street, Richmond, VA 23284-2512, while VCUHS' general counsel, Paul Neimeyer, is located at Samuel Putney House, 1010 E. Marshall Street, 2nd Floor, Richmond, VA 23298.

19. At all times relevant, Defendants acted under color of state law.

## FACTS

20. Dr. Clowdis had an active, unrestricted, license to practice medicine and surgery in the Commonwealth of Virginia since on or about August 7, 1991.

21. In the period from 2001 to 2004, Dr. Clowdis had a prolonged illness.

22. At the outset of his health problems, Dr. Clowdis voluntarily inactivated his license.  He never treated any patients while he was ill.

23. Dr. Clowdis' illness was compounded and caused by a dubious cocktail of pharmaceutical drugs his treating physician prescribed.  The prescription medications caused severe physical illness (Dr. Clowdis coded and nearly died from withdrawal) as well iatrogenic (medication induced) mental symptoms, notably depressive symptoms.

24. Near the peak of his illness, Dr. Clowdis developed seizures, and during the interim between seizures and in a state of involuntary intoxication an incident occurred at his residence for which Dr. Clowdis received several criminal charges.

25. Upon learning that Dr. Clowdis' actions resulted from involuntary intoxication (due to the medications being taken pursuant to physician's orders and resulting in

---

[1] *See* VCU Health System Organizational Structure, ttps://www.vcuhealth.org/upload/docs/VCU%20Org%20Chart.pdf (last visited 10/23/2015). General Counsel for VCUHS is now Paul Neimeyer, JD. VCU receives federal healthcare dollars through its medical campus at the Medical College of Virginia (MCV).  HPMP is associated with the Dept. of Psychiatry at VCU.

Clowdis' condition at the time, which is a "complete defense to all crimes" in Colorado, *People v. Garcia, Jr.* No. 03SC675, June 13, 2005, Colorado Supreme Court), the prosecutor chose to not prosecute Clowdis. Rather, the prosecutor offered Dr. Clowdis to enter diversion (deferred judgment) for a felony count if Clowdis would accept two of the lowest misdemeanors for reckless endangerment. Clowdis accepted this plea offer rather than endure the costs, both to him and his family as well as financial.

26. Dr. Clowdis was weaned off of all of the medications at his request in 2004 and was cleared by his physician to return to the practice of OB/GYN in 2005. Dr. Clowdis reactivated his medical license in 2006 (Dr. Clowdis made the decision to inactivate his license in 2001 when his treatment began for his illness).

27. During this time while on diversion and after being weaned off of all of his medications, Dr. Clowdis voluntarily enrolled in a physician health-monitoring program in Colorado, known as Colorado Physician's Health Program ("CPHP").

28. By 2007, Dr. Clowdis had successfully completed his diversion program[2] and established a clean bill of health. As a result, the Court dismissed the felony charge with prejudice.

---

[2] Under Colorado law, "following the successful completion of a deferred judgment, there no longer exists a plea of guilty to a felony, and there never existed a judgment of conviction. Thus, a professional licensing board may not discipline a licensee under § 12-38- 117(1)(b) who has successfully completed a deferred judgment for having been convicted of a felony or having pled guilty to a felony." *Weber v. Colorado State Bd. of Nursing*, 830 P.2d 1128, 1132 (Colo. Ct. App. 1992). Colorado Code C.R.S. 18-1.3-101 **Pretrial diversion. (10) Diversion outcomes. (b)** Upon the defendant's **satisfactory completion of and discharge from supervision**, the court shall dismiss with prejudice all charges against the defendant. The effect of the dismissal is to restore the defendant to the status he or she occupied before the arrest, citation, or summons. **A successfully completed diversion agreement shall not be considered a conviction *for any purpose*. A person with an order of dismissal entered pursuant to this article *may not be subject to charge, prosecution, or liability under Colorado law of perjury or otherwise giving a false statement* by reason of his or *her failure to recite or acknowledge* the arrest, citation, or summons in response to any inquiry made for any purpose.**

29. After completing diversion, Dr. Clowdis obtained a contract in December 2006 with a West Virginia hospital to return to work as an OB/GYN. Under the contract, the hospital agreed to provide supervision for the first several months (a paid mini-residency) to ensure Dr. Clowdis' skills were back up to speed after his long absence from the practice of medicine.

30. With contract in hand, Dr. Clowdis moved from Colorado to West Virginia in early 2007. Due to his residence change, he could no longer participate in CPHP, who requested that Dr. Clowdis notify the monitoring program in Virginia, which was the only state where Clowdis was licensed. Under a confidentiality agreement, Dr. Clowdis disclosed his participation with CPHP to the Virginia Health Practitioner Monitoring Program ("HPMP").

31. After determining that Dr. Clowdis could not participate in HPMP as he lived in West Virginia, HPMP violated the confidentiality agreement and notified the Virginia Medical Board. The Board's investigator, Bush, and counsel, Deschenes, for the Board apparently mistook the felony charge against Dr. Clowdis for a conviction. Within weeks, Defendant Ryals suspended Dr. Clowdis' medical license without a hearing on the sole ground that he was allegedly a convicted felon. The Board made no mention of any other reason for suspending his license at that time, i.e., substance abuse. Nor was any hearing held to enable Dr. Clowdis to formally refute the charge that he was a felon.

32. Dr. Clowdis (through his attorney) promptly sent proof to the Board showing that he was not a convicted felon. This included the Court Record and a statement from the prosecutor's office. He asked the Board to correct its mistake and negate the suspension.

8

The Board received this unequivocal proof, but did not hold a hearing.  The Board simply refused to reverse its prior peremptory suspension.

33. If a Colorado court had truly convicted Dr. Clowdis, that Court proceeding would have provided sufficient (14th Amendment) due process to justify the mandatory (peremptory) suspension in 2007.  But, because there was never any such conviction, the Board's action denied Dr. Clowdis due process.

34. The West Virginia hospital waited for Dr. Clowdis to resolve his problem with the Board.  But after several months, the contract was eventually rescinded.

35. Because he could not practice medicine or otherwise find gainful employment, Dr. Clowdis then went to law school (Fall 2008), under a V.A. Voc. Rehab. Program.  He completed law school in two-and-a-half years, and then attended a nationally recognized physician reentry program in Texas known as KSTAR in order to bring his medical skills up to speed.  Dr. Clowdis completed the KSTAR program in 2011 with excellent marks.

> In summary, Dr. Clowdis successfully completed all required components of the program in the above-mentioned six competency areas.  His preceptor, Dr. Grimes and I feel that he is clearly competent to resume full independent practice of OB/GYN medicine, both acute care and chronic care of women. There was no evidence of any compromise in his skills or behavior that would pose a risk to patients, in fact he has demonstrated excellence in every competency area.
>
> Sincerely,
>
> Joane Baumer, MD
> Program Director
> Chair
> Department of Family Medicine

36. Dr. Clowdis passed the bar exam in New York in 2011, but his bar admission was placed on hold due as a result of his suspended medical license.

37. When Dr. Clowdis applied for reinstatement of his medical license, Bush refused to accept any information to the effect that Dr. Clowdis was fit for practice including reports from physicians and a competency-testing program. The Medical Board, through its executive director, William Harp, MD, informed Dr. Clowdis of the board's intent to deny his petition for reinstatement based on its findings that Dr. Clowdis has a record of mental health problems in the past and because he had filed for and received disability benefits in the past. The Board stated this intent without holding any kind of hearing as to whether Dr. Clowdis had an existing drug or mental health problem.

38. In effect, Dr. Harp, speaking for the Board, found Dr. Clowdis to have a drug problem that would prevent him from practicing medicine, without first holding a fact-finding hearing.

39. The board also placed a record in the National Practitioner Data Bank ("NPDB") for doctors stating that Dr. Clowdis is a convicted felon. The Board also placed its statements on the Internet stating that Dr. Clowdis is a convicted felon and substance abuser. This is a public record. They were published before Dr. Clowdis had any kind of hearing in which to establish that they were false.

40. The Board did not give Dr. Clowdis a hearing on reinstatement until 2011, four years after his initial suspension. The Board informed Dr. Clowdis they would not reinstate his license without his completion of a residency. The only program in the U.S. at the time that offered a real 'hands-on' residency was the KSTAR program in Texas. After changing its rules (which took approximately a year) to allow an out-of-state physician with a suspended license (Dr. Clowdis) to be granted a temporary license to participate in KSTAR at the behest of the KSTAR Program's Chair, Dr. Joanne Baumer,

Dr. Clowdis was granted a temporary Texas license (without requiring monitoring) to participate beginning in January 2011. By that time, the Board was well aware of its error regarding the felony issue. The Board therefore switched their primary allegation at the hearing to the claim that Dr. Clowdis had a record of a disability and was a substance abuser, apparently as a pretext to justify the prior four years of unlawful suspension.

41. Prior to the hearing, Dr. Clowdis received several forensic psychiatric and independent medical evaluations, as well as competency evaluations finding that he had no current impairment and was competent to return to practice. These included:

a.  Dec. 1, 2005, Letter from Dr. Herbert Nagamoto, Chief, Mental Health Services Denver VAMC.

> "Dr. Clowdis *clearly remains capable of and is ready* to proceed with the steps necessary to allow him to again practice medicine, preferably in his chosen field of obstetrics and gynecology."

b.  Jan. 16, 2007, Forensic Psychological Evaluation, Dr. Marsha Franklin, Psy.D.

> "There are *no indications that he has a substance abuse problem, either with alcohol or drugs*."

> "The outlook for Dr. Clowdis' future is optimistic. It appears that *his functioning is well within normal limits.* **There is nothing that indicates that he cannot perform his job as an OB/GYN successfully**."

c.  March 8, 2010, Independent Medical Evaluation (IME), Joel Silverman, MD, ("Silverman") VCU.

> "He acceded to voluntary hair and urine screening. Drug tests returned negative."

> "*Dr. Clowdis presents himself clinically and on psychological assessment as a psychologically normal individual*."

11

42. In its 2011 Order, the medical board made *formal findings of fact* that **Dr. Clowdis had "no evidence of current psychopathology or substance abuse."** The Board also made the *formal finding of fact* that **the felony charge against him had been dismissed and not entered on his record.** Inexplicably, the Board made a finding of "law" that Dr. Clowdis is a convicted felon in direct contradiction to their finding of fact.

43. As a result of its findings, the Board stayed Dr. Clowdis' suspension, but Ordered that he undergo monitoring at HPMP, based on his remote history and record of a presumed "mental illness", citing only records dating from 2002 through 2004 as evidentiary support for this ruling.

44. There is a consensus of medical professional organizations and the courts (including the Eastern District of Virginia cited below) that a past record of mental health problems is the wrong standard for determining whether to suspend a physician's license.

**Physician Licensing: Disability and Impairment (Professional Organizations and Courts)**

a. "The salient concern is always the individual's **current capacity and/or current impairment.** Only information about current impairing disorder affecting the capacity to function as a physician, and which is relevant to present practice, should be disclosed."[3]

b. The AMA Model Impaired Physician Act avoids this trap. The model legislation "**clearly distinguishes impairment caused by alcoholism, drug abuse, or mental illness from professional incompetence.**"[4]

---

[3] American Psychiatric Association, Recommended Guidelines Concerning Disclosure and Confidentiality, Work Group on Disclosure (Dec. 12, 1992) at 1.
[4] Journal of Law and Health, *Vol 9, Issue 2, 1994-95, pp 273-302.* citing, The Impaired Health Professional, at 259.

c. "[F]irst, it is not appropriate to inquire about psychiatric history unless it is in the context of understanding **current functioning**; second, only information about **current impairments** affecting the capacity to function as a competent physician should be disclosed; and finally, applicants must be informed of the potential for public disclosure of any  information they provide on applications. Similar to the APA guidelines, the American Bar Association (ABA) has issued recommendations to state bar examiners for narrowing mental health inquiries on applications for the bar."[5]

d. "Professional organizations and the courts have asserted that an applicant's history of treatment or hospitalization for any illness is not an accurate prediction of *current ability to function as a competent physician*."[6]

e. In *Clark v. Virginia Bd. of Bar Examiners*, the **Eastern District of Virginia** court held that "even if open-ended questions are limited in time (i.e., within the past five years), that there was **no evidence of a correlation between past psychiatric treatment and current functional impairment**."[7]

45. At the time and because the Board's Final Order in 2011 did stay his suspension and restore his license, Dr. Clowdis assumed that the Board intended for him to be able to

---

[5] JOURNAL OF MEDICAL LICENSURE AND DISCIPLINE, **The Federation of State Medical Boards of the United States Inc.,** Volume 94, Number 4, Autumn 2008,  A National Analysis of Medical Licensure Applications, Sarah J. Polfliet, M.D. *citing* American Bar Association: Section of Human Rights and Individual Responsibilities. *Human Rights* 24:1, Winter 1997.

[6] *Id.* citing Testimony by Ray Q. Bumgarner, J.D., on behalf of the Federation of State Medical Boards of the United States, before the Committee on the Judiciary, Sub- committee on the Constitution, United States House of Representatives, May 22, 1997.

[7] *Id.* citing *Clark v. Virginia Bd. of Bar Examiners*, 880 F.Supp. 430, 440 (**E.D. Va**. 1995).

practice medicine, with occasional monitoring for a brief time from HPMP. Because Dr. Clowdis had child support obligations and could only take his OB/GYN Board recertification examination in June of 2011 without an additional year wait, and to facilitate his bar admission in New York, Dr. Clowdis did not appeal the ruling.

46. However, the Board's Final Order with respect to HPMP was so vague as to be deceptive. It stated that Dr. Clowdis must comply with any order given to him by HPMP, under penalty of having the stay of suspension lifted and possible revocation if he did not comply. Dr. Clowdis presumed that merely meant complying with such things as drug testing and attending counseling sessions. But the Board's Order did not set any limits or guidelines on what HPMP could order him to do.

47. In practice, this turned out to be a *de facto* renewal of his suspension (despite the Board's technical stay of suspension). After the 30 days for appeal had expired, HPMP told Dr. Clowdis that he would not be allowed to work indefinitely, until HPMP told him he could. Despite the fact that every drug test he took with HPMP was negative, HPMP refused to let him go back to work. This applied to non-medical work as well.

48. HPMP restricted Dr. Clowdis from physically leaving the state. (He was a resident of Illinois at the time of the 2011 hearing, but now forced to remain in Virginia). HPMP even restricted Dr. Clowdis from making a phone calls to hospitals in Texas interested in hiring him. All of this was subject to the penalty of revoking his license if he disobeyed.

49. In preparation for the 2011 hearing, as mentioned above, Dr. Clowdis privately hired Dr. Silverman to perform an "independent" medical evaluation ("IME"). Neither Silverman nor the Board informed Dr. Clowdis prior to, or even during, the 2011 hearing

14

that Dr. Silverman was the CEO of HPMP, and that he personally stood to profit from having Dr. Clowdis monitored by his HPMP. Not only did the Defendants fail to reveal this conflict of interest, but also at the 2011 hearing, Dr. Clowdis was specifically barred from presenting his other independent evidence that he was mentally stable and fit to practice medicine. Dr. Clowdis first learned that Dr. Silverman was the CEO of HPMP after the time of appeal, at the end of August 2011 at his first HPMP appointment.

50. It should also be noted that the Board used a standard of review in 2011 that Dr. Clowdis had to prove by clear and convincing evidence (with Dr. Silverman as the primary expert) that he was fully fit to practice medicine.

51. Proof by clear and convincing evidence is only the proper standard of review when seeking to reverse a prior finding that he was unfit to practice medicine due to mental health problems. Therefore, the use of this standard of review at a hearing to decide on first impression whether he had a drug or mental health problem was denial of due process. Furthermore, if clear and convincing evidence was required, then it was denial of due process for the Board to refuse to let Dr. Clowdis introduce evidence from the other independent psychological experts without conflicts of interests (besides Dr. Silverman, with the aforementioned conflict of interest) asserting that he was competent.

52. Ultimately, HPMP ordered Dr. Clowdis to sign a 5-year contract for continued monitoring. This contract included a statement admitting that he was a substance abuser with ongoing medical problems. When Dr. Clowdis attempted to strike out that "admission" from the contract, HPMP (counselor, Amy Stewart ("Stewart") instructed him that he could not change one word, or his license would be revoked.

53. Dr. Clowdis made informal appeals to the Board through Defendant Dixson, for relief from HPMP's arbitrary and unreasonable dictates. The Board ignored him.

54. Despite attempts made by Dr. Clowdis' attorney to work out a solution with HPMP whereby Dr. Clowdis could work, Dr. Clowdis, through his attorney, eventually suspended participation in HPMP pending discussions regarding his ability to work because he needed to earn an income (to pay child support and to support himself) and because he did not want to "admit" a falsehood – that he was a current substance abuser.

55. As a result, the Board convened a new hearing in 2013. Evidence for the February 2013 hearing was withheld from submission and/or admission into evidence by Foster, Stewart, HPMP, the Medical Board, Deschenes, and Harp, preventing Dr. Clowdis from countering the Defendants' acts in violation of the ADA, Title II. At that hearing, the Board found that Dr. Clowdis had failed to obey HPMP's orders. The Board refused to consider Dr. Silverman's conflict of interest and errors in his IME and to reconsider its error regarding the dismissed felony charge. The Board reinstated the suspension, reprimanded him and charged Dr. Clowdis a $5,000 fine. The Board thereby turned the *de facto* suspension into an explicit one.

56. Dr. Clowdis then the appealed (*pro se*) to the Virginia Circuit Court. However, to date, the Board has willfully chosen to refuse to send the records to the Court, even though required to do so by law. Consequently, the medical board stymied the case before the Virginia Circuit Court. Dr. Clowdis lost his board certification as a result.

57. The Board's suspension of Dr. Clowdis' license cannot be construed as a mistake of fact; rather, it is based on his *past* "record of" and/or being "regarded as having" a mental health disability citing records from 2002 to 2004.

    a.  "The psychiatrist [Dr. Silverman] testified by telephone that Dr. Clowdis

       demonstrated ***no evidence of current psychopathology or substance***

       ***abuse***." 2011 Va. Med. Bd. Order

    b.  The KSTAR Program Director, Dr. Baumer, "opined that he [Dr. Clowdis]

       is ***safe and competent to resume full independent OB/GYN medicine***,

       both acute care and chronic care of women.  She testified that she saw no

       evidence of a substance abuse or mental illness problem." Id.  (KSTAR

       involves a physician assessment and includes a 3-months physician-

       retraining program for qualified physicians, which Dr. Clowdis took and

       completed prior to the 2011 hearing, in order to assure the Board that he

       was competent to return to the practice of medicine.  While at KSTAR,

       Dr. Clowdis was supervised in practicing medicine by his preceptor and

       Dr. Baumer).

58. Nor did the Board cite a single piece of evidence that might indicate a current

problem.

59. Defendants have denied Dr. Clowdis his fundamental rights.

    a.  <u>Access to Courts</u>.[8]  The medical board has refused to transmit Dr.

       Clowdis' file for impartial review by the court as required by Virginia

       Code § 2.2-4027.

---

[8] *State of Tenn. v. Lane*, 541 U.S. 509, 124 S.Ct. 1978 (2004). Held: "As it applies to the class of cases
implicating the fundamental right of access to courts, Title II constitutes a valid exercise of Congress'
authority under §5 of the Fourteenth Amendment to enforce that Amendment's substantive
guarantees."

    b.  <u>Right to Interstate Travel</u>.  HPMP, under Board authority, explicitly

        ordered Dr. Clowdis to remain in Virginia under the threat of having his

        license revoked.

    c.  <u>First Amendment Right</u>.  HPMP, under Board authority, ordered Dr.

        Clowdis to not have any communications with any hospital, person or

        entity that could potentially lead to future employment.

    d.  <u>Liberty Interest</u>.  The Board publicly disclosed Dr. Clowdis' record of a

        disability, which was not relevant to his current competency to practice

        medicine, and which substantially affected his liberty interest.[9]  Likewise,

        HPMP, under Board authority, ordered Dr. Clowdis to not work as a

        physician or in any capacity in any occupation under the threat of

        dismissal from HPMP and license revocation.

---

[9] The ADA's definition of disability also recognizes the potential stigma attaching to treatment for mental illness.  Persons who have been diagnosed or received treatment for a mental condition may be covered by the third prong of the "disability" definition, regardless of whether they have ever suffered from an actual substantial impairment of a major life activity, 42 U.S.C. § 12102(2)(C). *See also* The title II regulation defines this prong to include persons who have "a physical or mental impairment that substantially limits major life activities **only as a result of the attitudes of others toward such an impairment** . . . ." 28 C.F.R. § 35.104 (1992).   As the Supreme Court has recognized, there is a substantial liberty interest under the Due Process Clause of the Constitution in avoiding the social stigma of being known to have been treated for a mental illness.  <u>Parham v. J.R.</u>, 442 U.S. 584, 600 (1979); <u>Addington v. Texas</u>, 441 U.S. 418, 426 (1979). In <u>Parham</u>, the Court found that a person's **liberty** is *"substantially affected"* by the **stigma** attached to treatment in a mental hospital: "The fact that such a stigma may be unjustified does not mean it does not exist.  Nor does the fact that public reaction to past commitment may be less than the public reaction to aberrant behavior detract from this assessment. *The aberrant behavior may disappear, while the fact of past institutionalization lasts forever*." <u>Parham v. J.R.</u>, 442 U.S. 584, 622, n.3 (1979) (Stewart, J., concurring in judgment). See also <u>Smith v. Schlesinger</u>, 513 F.2d 462, 477 (D.C. Cir. 1975) ("[m]ental illness is unfortunately seen as a stigma.  The enlightened view is that mental illness is a disease...but we cannot blind ourselves to the fact that at present, despite lip service to the contrary, this enlightened view is not always observed in practice") (ordering Department of Defense to present investigative file on plaintiff, whose security clearance had been revoked.) *See also* <u>In Re John Ballay</u>, 482 F.2d 648, 668-69 (D.C. Cir. 1973) ("[d]ischarged patients must not only cope with stigma of having once been hospitalized, but must often continue to cope with the 'mental illness' label itself....Even the most enlightened persons may unwittingly harbor views associated with this stigma.").

    i.  "The right to earn a living is among the greatest of human rights and, when lawfully pursued, cannot be denied.  Courts recognize the "gravity of the situation …" [w]ithout his license he will lose his practice, and without his practice, he will lose his livelihood." *Wills v. Board of Medical Examiners*, 384 S.E.2d 636, 638 (Ga. 1989).

    ii.  As a result, Dr. Clowdis could not earn income to pay child support. "The liberty interest at issue in this case – the interest of parents in the care, custody, and control of their children – is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville,* 530 U.S. 57, 65 (U.S. 2000)

60. Defendants, including but not limited to the Medical Board and the NPDB, have continued discriminatory acts against Dr. Clowdis to present.  This includes acts in retaliation of this complaint, whereby the Medical Board reported false information against Plaintiff to the NPDB, which the NPDB published, in June 2015.

61. Dr. Clowdis has suffered significant damages and continues to suffer damages as a result of Defendants' conduct.

**Claims for Relief**

**COUNT I**
**DISCRIMINATION BASED ON DISABILITY**
**(Title II of the ADA)**

62. Plaintiff incorporates by reference as though fully set forth herein the allegations in all of the preceding paragraphs.

63. Dr. Clowdis is a "qualified individual with a disability" as defined in 42 U.S.C. §12102(1)(C).

64. The Medical Board bases its suspension of Dr. Clowdis' license on a "record of" and/or being "regarded as" having a disability in violation of Title II of the ADA.

65. The Medical Board, HPMP operating in association with VCU are each a "public entity" under the ADA.[10]  The NPDB operates as a federal agency reporting data as provided by the Medical Board based in part, upon information provided by HPMP/VCU.

66. HPMP, through its agent, notified the Medical Board of Dr. Clowdis' confidential communication in March 2007, which prompted the Medical Board to investigate Dr. Clowdis based on the Medical Board's discrimination resulting in the wrongful suspension of his medical license.[11]

67. The Medical Board and HPMP (VCU) discriminated against Dr. Clowdis by arbitrarily and without a rational basis wrongfully suspending his license, ordering him to pay for services (surcharge) to cover its discriminatory measures, and the Medical Board continues to publish discriminatory statements directly and through the NPDB in violation of the ADA.

68. Dr. Clowdis attempted to work with Defendants after the 2011 hearing; however, because of Defendants' animus against Dr. Clowdis, they then increased the magnitude of

---

[10] A "public entity" is defined in title II to include "any department, agency ... or other instrumentality of a State ... or local government." 42 U.S.C. § 12131(1)(B). The Medical Board falls within this definition, as it is the State governmental agency responsible for licensing physicians in the Commonwealth of Virginia. HPMP, operating through VCU also falls within this definition.

[11] "Medical licensing is without a doubt something that the Medical Board "does". As such, we conclude that **medical licensing clearly falls within the scope of Title II**." *Hason v. Medical Bd. of California*. 279 F.3d. 1157, 1173 (9th Cir. 2002); "Dr. Hason states in his complaint that he *suffers from a mental disability*. Dr. Hason's complaint also alleges, however, that *by the time of the Medical Board's decision he had received treatment for his disability and was capable of practicing medicine.*" *Id.* "[W]e conclude that Dr. Hason states claims for which relief can be granted under Title II of the ADA." *Id.*

their discrimination causing more injury to Dr. Clowdis and deprived him of his Constitutional rights to freedom of speech, liberty, property, interstate travel, and right to work and support his family in violation of his fundamental Constitutional rights.

69. Dr. Clowdis had a second hearing before the Medical Board in 2013, where the Medical Board and its agents including but not limited to Dixson, Foster, Harp and Deschenes and Stewart on behalf of HPMP, continued to discriminate against Dr. Clowdis in violation of the ADA.

70. The Medical Board continues to publish discriminatory communications to the present, daily, by its own means and through the NPDB, in violation of the ADA.

71. Dr. Clowdis appealed the 2013 hearing; however, Defendants continue to the present date to refuse to comply with transmitting the evidence to the court for impartial review, where the court could overturn the discrimination, in order to cover up their prior discriminatory acts, denying Dr. Clowdis his fundamental right of access to the courts.

72. As a direct and proximate result of Defendants' unlawful discrimination, Dr. Clowdis sustained injuries and damages, which continue.

### COUNT II
### SECTION 504 OF THE REHABILITATION ACT OF 1973

73. Plaintiff incorporates by reference as though fully set forth herein the allegations in all of the preceding paragraphs.

74. Dr. Clowdis is a qualified individual with a disability as defined under Title 29 §705(9)(B) referencing Title II, 42 U.S.C. §12102(1)(C).

75. VCU receives federal funds at its medical campus, MCV, where HPMP's officers direct the activities of HPMP, including Dr. Silverman.

76. See Count I and references for discriminatory acts.

77. As a direct and proximate result of Defendants' unlawful discrimination, Dr. Clowdis sustained injuries and damages, which continue.

## COUNT III
## RETALIATION
### (Title II of the ADA)

78. Plaintiff incorporates by reference as though fully set forth herein the allegations in all of the preceding paragraphs.

79. Dr. Clowdis, by and through his counsel, provided notice to Defendants of his intent to file a lawsuit based upon Defendants' violations of his Constitutional rights and law, including but not limited to Defendants' discriminatory acts, causing harm to him.

80. After this notice was provided, Dr. Clowdis was dismissed from HPMP, and his license was subsequently, in effect, re-suspended.

81. Due to the re-suspension, Dr. Clowdis was afforded an administrative hearing to address the issues that led to his dismissal from HPMP, which included issues of ongoing discriminatory acts and deprivation of his fundamental rights under the Constitution, including freedom of speech, interstate travel, privacy, and liberty.

82. At the administrative hearing held in February 2013, Dr. Clowdis was not afforded the opportunity to address his issues.

83. Defendants further retaliated against Dr. Clowdis in response to his attempts to assert his rights to protect himself from Defendants' discriminatory acts by ordering a public reprimand against Dr. Clowdis, ordering him to pay a $5,000 fine, continuing the suspension of his license indefinitely, ordering him to reenter HPMP with any terms and conditions they may demand, and then published this Order publicly and via the NPDB.

84. Dr. Clowdis then filed a timely appeal of this order for impartial review by the court, where the order could be overturned.

85. Defendants retaliated by refusing to date to transmit the evidentiary record as required under the Code of Virginia to prevent Dr. Clowdis from protecting his rights and to cover up Defendants' discriminatory acts.

86. Defendants retaliated by filing an additional notice to the NPDB in June 2015 in response to Plaintiff's filing of the instant case pursuant to Title II of the ADA.

87. As a direct and proximate result of Defendants' unlawful and ongoing retaliation, Dr. Clowdis sustained injuries and damages, which continue.

**COUNT IV**
**DUE PROCESS OF LAW**
**U.S. CONST. AMEND. XIV & 42 U.S.C. § 1983**

88. Plaintiff incorporates by reference as though fully set forth herein the allegations in all of the preceding paragraphs.

89. Defendants, the Medical Board and its agents including but not limited to Hopson-Bush, Dixson, Foster, Ryals, Harp, Deschenes, HPMP, VCU, Silverman, MCV Physicians, Stewart intentionally have arbitrarily and irrationally classified and discriminated against Dr. Clowdis based on perceived disabilities and other characteristics and caused communications of their discrimination also through the NPDB in violation of due process.

90. Dr. Clowdis' license to practice medicine and surgery was wrongfully suspended without a hearing on or about April 26, 2007.

91. Dr. Clowdis, through his attorneys, provided the Medical Board documents showing that the Medical Board had wrongfully suspended his license. The Medical

23

Board still refused to reinstate Dr. Clowdis' license in violation of Dr. Clowdis' due process rights.

92. Dr. Clowdis was not afforded a hearing on the matter until four years later at which time the Medical Board maintained the correctness of its initial suspension.

93. Additional terms and conditions were assessed against Dr. Clowdis despite a conflict of interest on the part of Dr. Silverman and his HPMP in violation of Dr. Clowdis' due process rights.

94. Dr. Clowdis attempted to work with Defendants after that hearing; however, Defendants then increased the magnitude of Dr. Clowdis injuries and deprived him of his Constitutional rights to liberty and his property in violation of due process.

95. Dr. Clowdis had a second hearing before the Medical Board in 2013, where the Medical Board, Harp and Deschenes, continued to violate his rights to due process.

96. Dr. Clowdis appealed the 2013 hearing; however, Defendants have continued to deprive Dr. Clowdis of his due process rights.

97. As a result of the Medical Board's violations of Dr. Clowdis' rights to due process, he has suffered and continues to suffer significant damages.

**COUNT V**
**EQUAL PROTECTION**
**U.S. CONST. AMEND. XIV & 42 U.S.C. § 1983**

98. Plaintiff incorporates by reference as though fully set forth herein the allegations in all of the preceding paragraphs.

99. Defendants, the Medical Board and its agents including but not limited to Hopson-Bush, Dixson, Foster, Ryals, Harp, Deschenes, HPMP, VCU, Silverman, MCV Physicians, Stewart intentionally and with animus have arbitrarily and irrationally

24

classified and discriminated against Dr. Clowdis because of perceived disabilities and other characteristics in his past and caused communications of their discrimination to be publicly published using their own resources and also through the NPDB.

100.     By wrongfully suspending Dr. Clowdis' license to practice medicine and surgery, without a hearing on or about April 26, 2007, Defendants, acting under color of state law, set into motion a series (cascade) of fundamentally unfair procedures and deprivations to Dr. Clowdis, which are irrational and arbitrary and discriminatory against Dr. Clowdis' right to equal protection of the laws.

101.     Dr. Clowdis, through his attorneys, provided the Medical Board documents showing that the Medical Board had wrongfully suspended his license. The Medical Board still refused to reinstate Dr. Clowdis' license.

102.     Dr. Clowdis was not afforded a hearing on the matter until four years later at which time the Medical Board maintained the correctness of its initial suspension.

103.     Additional terms and conditions were assessed against Dr. Clowdis despite a conflict of interest on the part of Dr. Silverman and his HPMP in violation of Dr. Clowdis' right to equal protection under the laws.

104.     Dr. Clowdis attempted to work with Defendants after that hearing; however, Defendants then arbitrarily increased the magnitude of Dr. Clowdis injuries and deprived him of his Constitutional rights to liberty and his property in violation of his equal protection under the laws.

105.     Dr. Clowdis had a second hearing before the Medical Board in 2013, where the Defendants, continued to violate his rights to equal protection under the laws.

25

106.     Dr. Clowdis appealed the 2013 hearing; however, Defendants, including the Medical Board and its agents, Harp and Deschenes have arbitrarily continued to deprive Dr. Clowdis of his equal protection under the laws.

107.     An actual controversy exists between the parties, and Dr. Clowdis is suffering an ongoing and irreparable harm by Defendants' discriminatory treatment, and the harm will continue unless his license to practice medicine and surgery is reinstated without conditions and without restriction, the published discriminatory and erroneous communications and orders are sealed and declared unlawful by this Court.

**COUNT VI**
**STIGMA, DEFAMATION OF CHARACTER**
**Dr. Silverman, MCV Physicians,**
**Ryals, Harp, Deschenes, Stewart, Hopson-Bush, Foster**

108.     Plaintiff incorporates by reference as though fully set forth herein all of the allegations in the preceding paragraphs.

109.     Defendants acting in their personal and individual capacities, as well as in their official capacity, made false statements and or otherwise caused them to be published despite knowing the statements were false.

110.     Defendants' statements impugned Dr. Clowdis' good name, reputation, honor and integrity.

111.     Defendants' defamatory statements caused the termination of an employment contract Dr. Clowdis previously secured.

112.     Defendants' defamatory statements continue to foreclose other employment opportunities.

113.     Dr. Silverman personally/individually and acting under color of state law as the Chief of Psychiatry at VCU in his association with MCV Physicians and HPMP

including its agents and Stewart, by and through the Virginia Medical Board, its agents

and investigators Hopson-Bush and Stewart and the NPDB, published information

regarding Dr. Clowdis based on Dr. Silverman's IME.

114.     Dr. Silverman's statements regarding Dr. Clowdis are false,

unsubstantiated and refuted by all other healthcare professions not associated with him or

his Virginia HPMP program.

115.     Dr. Silverman's statements regarding Dr. Clowdis made to the Virginia

Medical Board published and made publicly available on the Board's website and

through the NPDB are defamatory in nature.

116.     Dr. Silverman's false statements about Dr. Clowdis were made by Dr.

Silverman, who had an undisclosed pecuniary interest in making such statements, for the

purpose of monitoring Dr. Clowdis for additional income for him and his HPMP

program.

117.     Dr. Clowdis suffered damages as the result of Dr. Silverman's false

statements, including but not limited to financial damages and damage to his reputation.

## COUNT VII
## STIGMA, DEFAMATION
### The Virginia Medical Board, HPMP, VCU, and NPDB

118.     Plaintiff incorporates by reference as though fully set forth herein all of

the allegations in the preceding paragraphs.

119.     The Virginia Medical Board and Harp through its own publications and

the NPDB, published false statements regarding Dr. Clowdis.

120.     The Virginia Medical Board's statements, which include false statements

by HPMP/VCU regarding Dr. Clowdis are false.

121.     These defendants' false statements impugn Dr. Clowdis' good name, reputation, honor, and integrity.

122.     These defendants' false statements caused Dr. Clowdis to lose his contract as a physician with Fairmont Physicians, Inc. and continue to foreclose other employment opportunities.

123.     The Virginia Medical Board's statements as signed by Harp regarding Dr. Clowdis as now made publicly available on the Board's website and through the NPDB are defamatory in nature.

124.     The Virginia Medical Board's statements as signed by Harp, made willfully and in bad faith, regarding Dr. Clowdis were made despite clear and convincing evidence to the contrary including Court documents showing the opposite to be true after its initial error was known to the Board to have caused Dr. Clowdis to lose his contract for employment as an OB/GYN in West Virginia.

125.     Dr. Clowdis suffered damages as the result of the Virginia Medical Board's false statements signed or otherwise endorsed by Harp and as published by the Board and through the NPDB, including but not limited to financial damages and damage to his reputation.

## COUNT VIII
## FRAUD
### Silverman, MCV Physicians

126.     Plaintiff incorporates by reference as though fully set forth herein all of the allegations in the preceding paragraphs.

127.     Dr. Silverman, and MCV Physicians, individually and acting under color of state law as the Chief of Psychiatry at VCU falsely represented to Dr. Clowdis that he

could perform an "independent" medical evaluation for the purpose of rendering an unbiased opinion to present on behalf of Dr. Clowdis before the Virginia Medical Board.

128.    Dr. Silverman's omission in disclosing to Dr. Clowdis his involvement in and being the CEO of the Virginia HPMP was a material fact necessary for Dr. Clowdis to determine the most suitable expert to perform his IME.

129.    Dr. Silverman intentionally and knowingly concealed the truth regarding his involvement in the Virginia HPMP as its CEO and carefully omits this material fact from his otherwise very extensive CV.

130.    Dr. Silverman acted with the intent to mislead Dr. Clowdis in order to perform Dr. Clowdis' IME where Dr. Silverman stood to gain not only his IME fees, but also income from his subsequent referral of Dr. Clowdis to his program for monitoring.

131.    Dr. Clowdis relied on Dr. Silverman as the expert he held himself out to be without any conflict of interest in the outcome of his IME and without other pecuniary interest in the outcome of the IME.

132.    As a result of being misled, Dr. Clowdis has suffered damages, including but not limited to financial damages.

## COUNT IX
## BREACH OF CONTRACT
### Silverman, MCV Physicians

133.    Plaintiff incorporates by reference as though fully set forth herein all of the allegations in the preceding paragraphs.

134.    Dr. Clowdis entered into a written contract with Dr. Silverman, individually as invoiced through MCV Physicians, to perform an independent medical evaluation at his VCU office on or about March 1, 2010.

135.     Dr. Clowdis was required to pay Dr. Silverman, invoiced through MCV Physicians, for Dr. Silverman's IME in advance of Dr. Silverman's performance of the contracted for IME.

136.     Dr. Clowdis' father made the required payment in full on Dr. Clowdis' behalf to Dr. Silverman (and to Dr. Gibson for testing at VCU) prior to the IME.

137.     Dr. Silverman breached his implied covenant of good faith and fair dealing by not being honest with Dr. Clowdis and purposefully withholding from Dr. Clowdis that he had a conflict of interest and could not perform an unbiased, independent medical evaluation for the Virginia Medical Board to review.

138.     Despite exhausting all administrative remedies available to Dr. Clowdis, including the appeal of the Virginia Medical Board's February 2013 Order, Dr. Clowdis has suffered actual damages caused by Dr. Silverman's breach stemming back to the initial Virginia Medical Board Order from May 2011.

## COUNT X
## CRIMINAL MEDICAL REFERRAL FOR PROFIT
## VA. CODE ANN.§ 18.2-502.[12]
### Silverman, MCV Physicians

139.     Plaintiff incorporates by reference as though fully set forth herein all of the allegations in the preceding paragraphs.

140.     Dr. Silverman, individually and through MCV Physicians, for profit referred or otherwise recommended Dr. Clowdis to the health related facility, HPMP, for medical care or treatment, including monitoring.

---

[12] In addition to violating state law, the acts of Silverman, MCV Physicians, HPMP and the Medical Board may be in violation of 42 USC § 1320a-7b(b)(1).

141.     Dr. Silverman did not advise Dr. Clowdis of the criteria of selection of the health-related facility considered for the referral or recommendation.

142.     Dr. Silverman withheld the fact that he was the CEO of HPMP from Dr. Clowdis.

143.     Dr. Silverman not only received a fee from Dr. Clowdis for his "independent" medical evaluation (IME) including any recommendations or referrals, but Dr. Silverman receives compensation as the CEO of HPMP and utilized VCU facilities for his personal profit in the performance of Dr. Clowdis' IME.

## COUNT XI
## CLAIM FOR WRIT OF MANDAMUS

144.     Plaintiff incorporates by reference as though fully set forth herein all of the allegations in the preceding paragraphs.

145.     Dr. Clowdis was arbitrarily discriminated against under Title II of the ADA, Sect. 504 of the Rehab. Act and his Constitutional rights to be afforded due process and equal protection under the law were violated, discussed *supra*.

146.     Dr. Clowdis' damages were further compounded by Defendants acting in bad faith or malicious intent with respect to each of the preceding counts.

147.     Dr. Clowdis has been forced to suffer damages as the result of Defendants' conduct.  Dr. Clowdis seeks a Writ of Mandamus to end the ongoing damage he suffers from the violations of his Constitutional rights, his rights under both federal and state law as well as federal and state common law.

### Request for Relief

WHEREFORE, in view of the facts and arguments herein, Plaintiff respectfully prays that this Honorable Court enter an order:

A.  Writ of Mandamus:

    a.  To enter a declaratory judgment declaring and finding that Defendants' actions are discriminatory under Title II of the ADA and are in violation of Plaintiff's Constitutional rights to be afforded equal protection and due process of law by promulgating false and misleading statements based upon the wrongful suspension of his medical license and findings by only providers who were known by Defendants to have a conflict of interest;

    b.  Directing Defendants to provide the prospective relief[13] of restoring Plaintiff's Medical License without fines, reprimands, suspension or any conditions or restrictions, and seal any records of suspensions, fines, reprimands, HPMP records, NPDB records, and publicly displayed references to the Board's actions to prevent future harm to Dr. Clowdis;

    c.  Directing Defendants to provide the prospective relief[14] of cooperating and assisting in the restoration of Dr. Clowdis' board certification in obstetrics and gynecology as well as cooperating and assisting with any information requested by any State Bar Dr. Clowdis has applied for admission (presently New York and Georgia) to prevent future harm to Dr. Clowdis;

    d.  Directing the NPDB to provide the prospective relief[15] of withdrawing any entries from the data bank referencing any of the Defendants' prior orders,

---

[13] *Ex parte Young*, 209 U.S. 123 (1908).
[14] *Ex parte Young*, 209 U.S. 123 (1908).
[15] *Ex parte Young*, 209 U.S. 123 (1908).

      suspensions, reprimands, fines, or otherwise erroneous information to prevent future harm to Dr. Clowdis;

B. Declaratory and injunctive relief from Defendants' violations of his Constitutional rights and federal law;

C. That Plaintiff is entitled to recover:

      a. Damages, including punitive damages, determined by this Court to have been sustained by him on account of Defendants' violation of Constitutional rights and federal law;

      b. Damages, including punitive damages, determined by this Court to have been sustained by him on account of Defendants' violation of Virginia state law;

      c. Award Plaintiff's expenses, interest and costs; and

D. Grant such other relief at law and in equity as justice requires.

## JURY DEMAND

Plaintiff requests a trial by jury on all issues so triable.

Dated: October 26, 2015

Respectfully Submitted,

William G. Clowdis, Jr., MD
*Pro Se*
16310 Red House Road
Red House, VA 23963
(304) 657-0118